FILED

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2012 NOV 13 A 11: 57

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**Jeffrey Kantor**

Plaintiffs,

1:12CV1289-TSE/TRJ

vs. **Civil Action No. ?TBD**

**Appian Corporation**

Defendant.

## COMPLAINT

### I. Preliminary Statement

This is a civil action wherein the plaintiff, Jeffrey Kantor (the "plaintiff"), alleges that his employer, Appian Corporation, engaged in retaliation when the plaintiff alleged he was discriminated against based on religion and the plaintiff further allege that the defendants violated Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq. which provides relief against discrimination in employment on the basis of race and religion, and that defendants retaliated against plaintiffs in violation of 42 U.S.C. 1981 and 42 U.S.C. § 2000e-2(a) and other laws.

### II. Jurisdiction and Venue

1. Plaintiffs invoke the jurisdiction of this Court pursuant to 29 U.S.C. § 621 *et seq*, and 28 U.S.C. § § 1331 and 1337, and 42 U.S.C. § 2000-e et seq.. The matter in controversy arises under an act of Congress regulating commerce and relating to race discrimination. Supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. § 1067.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the Defendant was doing business in this district, and the activities giving rise to the plaintiffs' claim took place in this district.

3. Plaintiff timely filed charges of discrimination and retaliation in violation of Title VII, with the EEOC and files this suit within 90 days of the receipt of the right to sue letters received by each.

### III. Parties

4. The Plaintiff, Jeffrey A Kantor, (hereinafter "Kantor") is a Jewish -American citizen of the United States.

5. Defendant Appian Corporation, (hereinafter "Appian") is a software company based in Reston,

Virginia.

### IV. - Facts

6. Plaintiff Kantor was employed by Appian from April, 2009 until April, 2011, when he was terminated.

7. Kantor worked the entire time as a contractor for the Army at Ft Belvoir, Virginia on the Army Knowledge Online and Defense Knowledge Online systems. Northrop Grumman was the prime vendor. CRGT was the sub-contractor under Northrop Grumman. Appian corporation was a sub-contractor under CRGT.

8. In October of 2009, Kantor used the search engine Google to try to find, "How do I build a radio controlled airplane." He ran this search a couple weeks before the birthday of his son with the thought of building one together as a birthday present. After typing, "how do I build a radio controlled" google auto-completed his search to "how do I build a radio controlled bomb."

9. Kantor was studying chemistry at the time at George Mason University. Kantor was taking the courses in anticipation of applying to medical school. He was therefore concerned about the possibility that the google search in conjunction with his studying chemistry at GMU might result in some type of government investigation.

10. The google search occurred over a weekend. The following week, all of the other workers in Kantor's area met with government investigators. The coworkers in his cubicle area were Stephanie Buchner and Qem Lumi, who worked for Northrop Grumman, JR Ector and Li Min, who worked for CRGT and Tony Nemil, who worked for a company that was a sub-contractor to Northrop Grumman.

11. After the meeting between the government investigator and all of the other members of Mr Kantor's work area, Stephanie Buchner, of Northrop Grumman, said within earshot of Kantor, that the meeting was really strange and that she couldn't believe it, but she would not tell Kantor the details of the meeting.

12. All of the members of Kantor's work area started pretending to be interested in Kantor's hobbies and interests with one exception: Tony Nemil started making a series of antisemitic comments. Kantor is Jewish. This seemed to be a good cop bad cop approach. The EEOC finding states that it was only one incident, however, Tony Nemil made antisemitic comments repeatedly over the course of five months of sitting next to Kantor, who was one of the only Jewish contractors at the Army Knowledge Online project.

13. In October of 2010, Kantor's manager at Appian, Mike Kang, made a statement that implied that Kantor was under investigation and that Northrop Grumman employee Stephanie Buchner was filling out investigation reports on him.

14. In January of 2011, Kantor complained to the Anti Defamation League about what he perceived as

the government's use of antisemitism as an investigation technique. Kantor told Stephanie Buchner that he had filed the complaint with the Anti-Defamation League and verbally accused Stephanie Buchner of being involved with what was going on including Tony Nemil making the antisemitic remarks.

15. Later that day, Stephanie Buchner's manager, Deborah Daniels told Kantor that Stephanie Buchner had told her about what he said and that Kantor needed to talk to his own management at Appian about it.

16. Kantor then became the target of vicous group stalking (also commonly referred to as gang-stalking) at the hands of Northrop Grumman and CRGT personnel. Every day at two oclock his coworkers would repeat back his private information and then talk for an hour about how people dropped dead from stress and hypertension.

17. If Kantor ever got angry after his private information was repeated back (by slamming a cabinet or typing loudly on his computer), the CRGT and Northrop Grumman employees would tell the same story about how there was neighbor in their community who seemed like such a nice guy, but then went on a murder suicide. If Mr Kantor stayed calm after they repeated back his private information, they would instead spend the hour talking about how people drop dead from hypertension. This happened every day for almost three months.

18. Every time Kantor walked to his cubicle during his last two weeks on the army knowledge online project, an African-American woman would say as he passed, "He has been here two years and he won't quit." Kantor had been on the project two years. This happened everytime Kantor walked to his desk, which was multiple times a day.

19. The final week before Kantor requested that Appian transfer him to another project, the stalking started occurring outside of work. Two days before Kantor requested to be transferred, he drove to a park area of Ft Belvoir after work. He hiked on a trail and returned to his car, which was in an isolated area (where no one normally parks). There was a van next to his car and there were three men. As Kantor returned to his car, one man says to the other, "He has been here two years and he won't quit. I guess he is trying to prove a point." Kantor was able to ignore the group stalking that had occurred at his office up until this point, but was very concerned that being followed outside of work represented a whole new threat level. It was at this point that he decided to ask Appian management to transfer him to another project. He also consulted with his father, an attorney in New Jersey, who advised Kantor to specifically mention to Appian that the harassment included antisemitism.

16. All of the people participating in the group stalking that Kantor knew of were CRGT and Northrop Grumman personnel, with one exception. His manager, Mike Kang had participated in one occasion in the group stalking. Kantor had driven to lunch with his Appian manager, Mike Kang. Mike Kang asked Kantor what movies his wife likes. Kantor answered and politely asked Mike Kang what movies his wife likes. Kang stated that his wife likes "the Girl with the Dragon Tattoo" and the "Harry Potter" movies. Kantor thought that this was strange since at the time the only version of "the Girl with the Dragon Tattoo that existed was in Swedish and Harry Potter was a kids movie. Kantor also thought this was disturbing because those were the exact two books that he was reading. The second book Kantor was reading to his son. When Kantor returned to his office, the CRGT manager, Tony Buzanca,

immediately asked Kantor what books he was reading, smirked, and walked away not waiting for a response.

17. This same CRGT manager, Tony Buzanca, had repeated back Kantor's private information on numerous other occasions. He would typically repeat back his private information, smirk, and then walk away not waiting for a response. The private information that he would repeat back would typically be very sensitive things that Kantor did now want to publicly discuss or disclose. Kantor did not know how Tony Buzanca or the other Northrop Grumman and CRGT employees gained access to his private information.

18. Kantor does not know and may never know the exact purpose behind this harassment. Kantor suspects that it was being done in retaliation for his reporting the use of anti-semitism as an investigative technique to the Anti Defamation League. Kantor has subsequently filed FOIA/PA requests with the FBI, the NSA, and the Army, and they were all denied. At the time that Kantor complained though, he had information from his Appian manager that it was an investigation, and the CRGT manager had implied that everyone in his cubicle area was in on it together, which implied that Tony Nemil, who made the antisemitic comments was also in on it.

19. Kantor had overheard CRGT employees talking about him in the restaurant inside the engineering compound at Ft Belvoir. Kantor had never disclosed to anyone he worked with that he was planning on applying to medical school. They said that Kantor was applying to medical school, he thought that everyone was out to get him, and that the trunk of his car was being searched for an AK-47. At the time someone was shooting military targets in the Northern Virginia area including the Pentagon, the Marine Corps museum, and a Marine Corps recruiting station in Chantilly, Virginia. At the time, FBI profilers were publicly stating that the suspect was someone with ties to the military that had a grudge against the military. Kantor worked as a contractor for the military, however, he has no grudge against the military other than the harassment that occurred. In fact, Kantor worked tirelessly to help the military on the AKO project. Kantor was literally on call 24x7 and received support calls around the clock – day and night – and always provided support. The person in this shooting later turned out to be a disgruntled marine. Kantor's manager, Mike Kang, asked Kantor numerous times about these shootings as they were occurring.

19. Kantor complained to Appian on Wednesday morning after having been followed after work on Monday and Tuesday. Chris O'Connel, a director in charge of Appian's federal consulting division told Kantor initially that he would reassign him to another project. Kantor was interviewed by Chris O'Connel and the Appian Human Resources Manager. Kantor met Chris O'Connel on Thursday and turned in his army security badge. Kantor was scheduled to take a vacation day on Friday.

20. The following Monday when Kantor went to report to Chris O'Connel's office at Appian's Reston headquarters, Kantor was terminated. Kantor was told that he had requested to work on a non-DOD project (because he felt he was being harassed) and they did not have any open positions on a non-DOD project.

21. Kantor then asked to be assigned to the other DOD project that was not with the army, which he was told had openings. He was told that they couldn't assign Kantor to another project since he felt that there was a government conspiracy against him. The EEOC had found that Mr Kantor refused work,

however this is not accurate. It is true that Kantor had initially asked to be transferred onto a non DOD project (since he was being harassed), however Kantor asked to be assigned to a different DOD project when he was told that there was no other work available.

22. The EEOC finding references the fact that Kantor erroneously believed that he was under an investigation. This however is one of two possibilities. The other possibility is that Kantor was was correct about the investigation and the investigation was classified to cover up the use of antisemitism as an investigation technique. Regardless, it is unfair for Appian upper management to punish Kantor for believing at the time that he was the subject of an investigation since his Appian Manager had made a statement implying that he was the subject of an investigation.

23. After firing Kantor, Appian director Chris O'Connel escorted Kantor out of the building. O'Connel said to Kantor that he could have transferred Kantor to another project if Kantor had quietly come to him and not mentioned harassment. But because he made allegations of harassment and because Kantor had included Appian upper management in the transfer request , O'Connel couldn't transfer Kantor to another project. O'Connel then said that the word "harassment" has legal connotations. O'Connel's statement was almost the textbook definition of retaliation for reporting harassment.

24. Appian management sighted the fact that Kantor waited too long to report the harassment. The EEOC also referenced this in their investigation. However, Kantor did not have sufficient information at the time to make an accusation that the antisemitic comments were made as part of an investigation. Mr Nemil left AKO in March of 2011. Kantor did not learn that these comments were made as part of an investigation until much later. Regardless, according to the EEOC, being fired after reporting harassment resets the proverbial clock. Kantor contacted the EEOC within 6 months of being wrongfully terminated, which is the only deadline that matters.

### V. Count One

### Violation of 42 U.S.C. § 2000e-3

### Retaliation for reporting Racial Discrimination

### Against Appian Corporation

25. The allegations of each of the foregoing paragraphs are incorporated herein as if realleged.

26. Appian Corporation is employer subject to Title VII under 42 U.S.C.A. § 2000e(b), having 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and/or the agent of that person.

27. Plaintiff suffered adverse employment action which was causally connected between the plaintiff's actions and the harm suffered.

28. Aforementioned acts and utterances by Defendants were made because of Plaintiff's expressed

opposition to earlier discriminatory acts and utterances, and because of their complaints to their superiors and others about such acts.

29. Aforementioned acts and utterances by sub-contractor of Northrop Grumman were made with and are based upon racial and racist animus, and constituted unlawful discrimination based on Plaintiff's religion. Though not overtly antisemitic when considered in isolation, when the multiple statements made by the Northrop Grumman subcontractor are considered holistically, it is obvious that he made the statements intending for them to be peceived as antisemitic. There was intent by the individual making the statement, and there was impact felt by the plaintiff. By stating that Jew after Jew was controlling the US government through the Central Bank, he was intending Mr Kantor to perceive that he believed that he was stating that Jews were controlling the US government through control of the Central Bank. The Anti-Defamation League on their website has a page dedicated to debunking this false antisemitic myth that the ADL states is frequently promoted by white supremacist organizations. Kantor believed at the time based on a comment made by his Appian Manager shortly before he reported it to Appian upper management that this was done as part of an organized investigation related to a bogus terrorism investigation of Kantor as some sort of perverted good cop / bad cop routine.

30. Kantor initially complained to the ADL, and told a Northrop Grumman coworker that he had done so. He was subsequently brutally harassed by Northrop Grumman and CRGT employees for the next three months. In March, of 2010, people began following Kantor around outside of work and making harassing statements. Kantor discussed this with his father, an attorney, who told Kantor that he had to get out of that situation and Kantor then decided to report the situation to Appian upper management and request a transfer. Kantor was concerned that since his direct manager had participated that Appian was already aware and would fire him for reporting what was transpiring at the client site. Kantor's father instructed Kantor to specifically mention that the harassment included antisemitism since this would give him protection under the law. Kantor reported what transpired and mentioned that the harassment included antisemitism, and Kantor was fired anyway.

31. In one incident, Kantor's direct manager, Mike Kang, engaged in the same group stalking that the Northrop Grumman employees engaged in. Kantor's manager, Mike Kang, also made a statement to him that what was being done was part of an investigation. This means that some management elements of Appian Corporation were privy to what was occurring. The Appian HR manager who fired Kantor, may have been unaware. This is most likely an instance of the left hand not knowing what the right hand is doing.

32. The group stalking that was occurring against Kantor by Northrop Grumman, CRGT, and Appian employees appeared to be in retaliation for Kantor complaining to the Anti-Defamation League about government investigators using antisemitism as an investigative technique.

33. The group stalking included repeating back Kantor's private information, and then if Kantor showed no emotion they would immediately talk about how a person dropped dead from stress or hypertension. In a few instances where Kantor showed emotion and got angry after they repeated back his private personal information, they would immediately tell a story of how a neighbor in their community, who seemed like such a nice guy, went on a murder-suicide. Kantor estimates this happened a hundred times. Kantor tried to ignore it and just focus on his job. But after the group stalking started occurring

outside of work, Kantor felt compelled to complain to upper management and request a transfer.

34. Appian Corporation conducted a bogus investigation that lasted only a couple days and then almost immediately fired Kantor, rather than honoring Kantor's request to get transferred to a project where he felt like he wouldn't be subject to further harassment.

35. When Kantor was being let go, he was told that they were trying to honor his request to be transferred out of a DOD project, but they had no other work so they were letting him go. In response to being told that they had no work other than DOD projects, Kantor asked to be transferred to a different DOD project, but was told by Appian that they would not transfer him since he felt like there was a government conspiracy against him. This was blatantly unfair since Kantor's Appian manager had made a statement that directly implied that there was in fact an investigation against him. And the CRGT manager made a statement that everyone in his cubicle area was working together against him – which implies that the person making the antisemitic comments was working together with the other people in the cubicle in the investigation as part of a good cop / bad cop routine.

36. Kantor cannot prove that there was an investigation since investigations of this type are typically classified. Whether there was or was not an investigation is immaterial. Kantor believed that there was an investigation at the time based on statements made to him by his manager. When the army told Appian that there was no investigation, Appian should have simply assigned him to another project or let him continue to work on the project at the Army. Instead, Appian fired Kantor after reporting incidents of antisemitism.

37. Appian cited in their defense to the EEOC that Kantor waited too long to report the incident. However, Kantor did not have information at the time that the antisemitic comments were made as part of an organized investigation. Kantor was only given information later that this was the case. This is why Kantor complained at a later date. Furthermore, the group stalking was occurrring at this time, which was most likely in response to Kantor complaining to the Anti-Defamation League about what he perceived at the time to be the government's use of antisemitism as an investigative technique.

38. As a result of Defendants' discriminatory actions, Plaintiff has suffered lost income and lost wages.

39. Plaintiff is now suffering and will continue to suffer irreparable harm and injury as a result of Defendant's policies, practices, customs and usages as set forth herein.

40. As a direct result of Defendant's discriminatory and wrongful acts as set forth herein, Plaintiff has suffered lost wages, income and expenses, emotional distress, humiliation, embarrassment and mental anguish.

**WHEREFORE**, with respect to Count 1, the plaintiff respectfully pray that this Court:

    a. Issue a declaratory judgment that the defendant's acts,

policies, practices and procedures complained of herein violated the plaintiffs' civil rights as secured by 42 U.S.C. §§ 1981, 1985, 1986 and 2000e *et. seq*; and the First Amendment of the United States Constitution; and

b. Order the defendants to make whole the plaintiffs by providing appropriate back pay and other benefits wrongly denied in an amount to be shown at trial and other affirmative relief;

c. Enjoin further race and religious discrimination by the defendants and restrictions and violations of plaintiffs' First Amendment rights;

d. Grant plaintiffs their attorney's fees, costs and other disbursements; and

f. Award compensatory, punitive, and liquidated damages in the amount of $45,000,000.00 or such greater amount as may be proved at trial or such other sum as the law may provide; and

e. Award front pay if appropriate in an amount to be proved at trial; and

f. Grant such additional relief as the Court deems just and proper.

A TRIAL BY JURY IS REQUESTED

This 13th day of ~~May, 1999.~~ November, 2012.

Respectfully submitted,

**Jeffrey Kantor**

*[signature]*

803 Plum St SW
Vienna VA 22180
703-946-5872